# STATE OF VERMONT

# ENVIRONMENTAL COURT

|  | } |  |
| --- | --- | --- |
| **In re: Hamm Mine Act 250 Jurisdiction** | } | |
| **(Jurisdictional Opinion #2-241)** | } | **Docket No. 271-11-06 Vtec** |
|  | } | |

## Decision on the Merits

The Hamm Mine in Windham was first established in 1982, principally to mine the soft stone material known as talc. It was an open pit mine. After its owners ceased operation, the open pit began to fill with water.

On October 26, 2006 the District #2 Environmental Commission Coordinator issued a jurisdictional opinion in which she concluded that the Hamm Mine property remained under Act 250 jurisdiction, even though its state land use permit had been allowed to expire and all reclamation work had been completed. The current property owner and last operators of the mine thereafter filed a timely appeal of the Coordinator's jurisdictional opinion. The Court conducted a site visit and de novo merits hearing over five days. This Merits Decision addresses all issues preserved for review in this jurisdictional opinion appeal.

Appellants Luzenac America, Inc. and U.S. Talc Co., Inc. ("Luzenac") are represented throughout this proceeding by George McNaughton, Esq.; Appellant Sean T. Reese is represented by Richard D. Perra, Esq.; James McCandless, who as Trustee of the B.W. McCandless Trust, is the title holder to property that adjoins the Hamm Mine property, appears in this proceeding through his attorney, Robert E. Woolmington, Esq.; the Land Use Panel of the Vermont Natural Resources Board ("NRB"), appears in this proceeding through its staff attorney, Melanie Kehne, Esq.

Based upon the evidence admitted at trial, some of which was put into context by the site visit conducted with the parties, the Court issues the following Findings of Fact and Conclusions of Law:

## Factual Findings[1]

---

[1] Some of the Factual Findings recited here are similar to several of the paragraphs in the "Factual Background" section of the Court's Decision on Appellant Luzenac's Motion for Summary Judgment, issued on September 27, 2007 ("September 27, 2007 Decision"). This is not a coincidence, as some facts once deemed uncontested remained material to our adjudication of the legal issues addressed in this Merits Decision, and some facts which may have once been disputed were proved accurate, based upon the credible evidence presented at trial.

1.	In 1981, Vermont Talc, as a division of OMYA, Inc., acquired 84± acres from the Hamm family, upon which the company intended to establish a talc mine.  The company owned several other nearby parcels, one of which was the site for a pre-existing mine, known as the Windham Mine.

2.	Vermont Talc first received land use approval for the subject talc mine, known as the Hamm Mine, when the District #2 Environmental Commission ("Commission") issued Act 250 Land Use Permit #2W0551 ("Permit #2W0551") on October 20, 1982.

3.	Permit #2W0551 directed that the Hamm Mine project "shall be completed . . . in accordance with the plans and exhibits stamped "Approved" and on file with the District Environmental Commission, and in accordance with the conditions of this permit."  Id. at ¶1.  The development authority conferred by the Permit was conditioned upon the restriction that "[n]o changes shall be made in the project without the written approval of the . . . Commission."  Id.

4.	As is the customary practice in its review of "major applications," [2] the Commission also issued written Findings of Fact and Conclusions of Law with Permit #2W0551.

5.	The Findings of Fact that accompanied Permit #2W0551 noted the applicant's plan to pump water from the bottom of the mine to an adjacent holding pond.  The site map stamped "Approved" in connection with this initial application, copies of which were admitted at trial as Exhibits L and L-1, shows that this pond was to be constructed next to the southeast corner of the mine, closest to property then owned by Karl and Olga Dietrich.

6.	Water was to be pumped into this pond from the bottom of the mine, to "dewater" the area during mining operations.  The approved pond was of a sufficient size to allow the pumped water to stand for two to three days, so that any suspended solids in the water could settle.  The applicant's plan called for the clearer water to then flow from this settlement pond, through an outlet pipe, onto a rip raped swale and then discharge onto lands further to the southeast, including the Dietrich lands.  The Findings of Fact and Conclusions of Law specifically noted that the permittee "agreed to come back for an amendment if there is any work that will change the quantity or quality of the runoff in the direction of Mr. Dietrich's property."  Id. at ¶4(E).

---

[2]  When an Act 250 application is deemed a "major" application, the Commission will conduct a site visit, one or more hearings to take evidence, and issue formal written Findings upon which its permit or denial of a permit is based, all pursuant to former Environmental Board Rule 2.

7.      The Findings of Fact and Conclusions of Law also specifically noted the identified sedimentation pond, together with associated "culverts" and "rip rap" would constitute portions of the mine's "[p]ermanent erosion controls." Id at 4(C).

8.      While the plan and practice during the mining operations had been to pump water from the bottom of the mine into this sedimentation pond, the approved site plan (Exhibits L and L-1) also called for a pipe and rip rapped swale to be installed from the southeast lip of the mine to this sedimentation pond, thereby allowing water to flow from the mine to the pond, if and when the mine filled with water.

9.      This particular sedimentation pond and discharge structures may have been built in the early stages of the mine, but were abandoned as the mine operation continued.[3]  A permit amendment was never sought nor received to authorize their omission.

10.     The evidence at trial was somewhat unclear as to why the permittee discarded the original sedimentation pond and discharge structures. What was undisputed at trial was that the permittee changed its plan for sediment treatment at the Hamm Mine by substituting an alternate set of settlement ponds to the northwest of the mine, in a portion of the area originally designated for overburden storage.  This new plan called for water to be pumped out of the bottom of the mine to the first of the new retention ponds, where the mine sediment settled out and the clearer water flowed to a second pond or wetland area, where the water would gradually percolate into the ground.  There was no evidence presented at trial that contradicted Luzenac's representation that this alternate sedimentation plan worked in a satisfactory manner during the period in which the Hamm Mine was operational.

11.     Luzenac asserted that Commission staff had notice of this alternate sedimentation pumping and treatment procedure during the operation of the mine, which fact was not disputed by the NRB.[4]  It was also undisputed at trial that no amendment to the original permit was applied for or issued that authorized this change to the permittee's sedimentation plan and omission of the approved erosion control structures.

---

[3]  Exhibit 9 is a photo depicting the mine in 1991, in active operation.  In the upper left corner of the photo is a grassed area that appears to include a depression that may have been this original sedimentation pond.  The photo does not show any rip rapped swales or piping.  The Court visited this area during its site visit with the parties and recalls viewing some area of depression, although not the full sedimentation pond and discharge structures as depicted in the originally approved site plan (Exhibits L and L-1).

[4]  The NRB has administrative authority of the various district environmental commissions and has the right to intervene in Act 250 appeal proceedings before this Court.  10 V.S.A., Chapter 151, subchapter 2.

12. In the 1982 Findings of Fact, the Commission briefly discussed a reclamation plan for the mine site. The single reclamation plan condition required that the opening of the mine be the final grade for the closing of the mine. Thus, it was planned that the project would have shallow slopes leading down to a stable water level below the top of the mine, so that the resulting pond could be used for recreation or as a fire department water pond. Id. at p. 5, ¶9(D,E)(2).

13. The 1982 Findings and Conclusions also contain a specific determination that "[t]here will be no unreasonable soil erosion or effects on the capacity of the land to hold water . . .." Id at p. 3, ¶4. This determination comports with 10 V.S.A. § 6086(a)(4) (i.e., Act 250 Criterion 4). In rendering this determination, the Commission noted that "[p]ermanent erosion controls consist of culverts, rip rap, a sedimentation pond and seed and mulch." Id. at ¶4(C). We conclude that this reference was to the specific sedimentation pond and discharge structures referenced in the originally approved site plan (Exhibit L and L-1) and referenced above in ¶¶5–9, inclusive.

14. The following permit amendments were issued over the life of the Hamm Mine:

- Amended Permit #2W0551-1, issued by the Commission on September 18, 1984 (Exhibit 4);

- Amended Permit #2W0551-1C, issued by the Commission on March 15, 1985 (Exhibit 5);

- Amended Permit #2W0551-1-EB, issued by the former Vermont Environmental Board on June 21, 1985, after an appeal by Vermont Talc (Exhibit 6);

- Amended Permit #2W0551-A, issued by the Commission on November 27, 1991 (Exhibit 7); and

- Amended Permit #2W0551-2, issued by the Commission on November 15, 1995 (Exhibit 8).

None of the applications which sought these amended permits referenced the abandonment or replacement of the sedimentation pond and discharge structures originally approved in 1982 or the replacement structures actually constructed and used in the operation of the Hamm Mine.

15. In the course of the operation of the Hamm Mine, several entities expressed concerns about the potential for water to travel from the mine onto neighboring lands and cause damage. During a discussion on September 5, 1995, concerning the then-pending permit amendment application, the Assistant District Coordinator related several concerns, including those expressed by Mr. McCandless (father and predecessor trustee to the Mr. McCandless who is a party to these proceedings) "about mine water" and a request for the mine operator's estimate of "when or if the mine will fill with water." See internal Luzenac memo from Bob Goff, dated

4

September 25, 1995, a copy of which was admitted at trial as McCandless Exhibit X. During his discussions, Mr. Goss recommended that "the company contact Mr. McCandless to assure him of our intention to maintain full control of all water." Id. He further stated that "Luzenac is prepared to monitor and pump the sump as required" and concluded by assuring that "[t]o prevent problems here, we will come back to you with any recommendations and solutions, as we want to separate this situation [i.e., the neighbors' expressed concerns] from the new amendment." Luzenac was at that time seeking a permit amendment to expand the existing overburden disposal area, near where the new sedimentation ponds had been constructed.

16. On December 1, 1997, a Luzenac representative met with the Town of Windham Selectboard, seeking the Selectboard's agreement to allow Luzenac to "suspend" its annual $10,000.00 road maintenance payments. See internal Luzenac memo from Howard Clay dated December 2, 1997, a copy of which was admitted at trial as McCandless Exhibit Y. Mr. Clay offered the rationale to the Selectboard that the road maintenance payment should be suspended, since "no mining [had occurred] since mid 1995, and no immediately [sic] plans to go back to mining at the Hamm site." Id.

17. During the course of his discussion with the Selectboard, Mr. Clay received a comment "that a neighbor's property would likely be flooded if the pit was allowed to overflow." Mr. Clay responded by assuring the Selectboard that Luzenac was "monitoring the pit water level routinely and would pump it down before it overflowed onto someone's property." Id.

18. To the extent that the 1995 Goff memo (Exhibit X) and the 1997 Clay memo (Exhibit Y) represented duties assumed by Luzenac—as the then permittee—to monitor, pump mine water or make some further disclosure, there was no evidence introduced at trial that Luzenac disclosed these duties to the current owners of the property, Mr. and Mrs. Reese. There was also no evidence presented as to what follow-up actions were taken on Luzenac's behalf.

19. Land Use Permit #2W0551 provided that it would "expire on October 15, 2002, unless extended by the District Commission." Id. at ¶ 8. No extension was sought and the Permit expired by its terms on that date.

20. On October 2, 2002, Luzenac wrote to the Assistant District #2 Coordinator, representing its full compliance with the permit conditions and outlined the company's future plans for the property, which were to let the permit expire, complete reclamation and sell the property.

21. In 2002, Appellant Reese and his wife, Elizabeth, purchased the property from Luzenac. There was no representation at trial that Luzenac disclosed to the Reeses that the originally-

5

approved sedimentation pond and related erosion control measures approved in 1982 had not been built, and that approval for the alternate sedimentation treatment plan had not been sought or granted by the Commission.

22. James McCandless, as successor trustee of the B.W. McCandless Trust, is the title holder to property that adjoins the Hamm Mine property. The McCandless property consists of 201± acres of land, located on either side of White Road in Windham. The McCandless property abuts the Reese property, with the location of the former mine near the western boundary of the upper McCandless field. The McCandless property consists of an undeveloped field on the westerly side of White Road and several other fields, 1820s-era farmhouse and large post-and-beam barn on the easterly side of White Road. The residence sits in an open meadow, and the McCandless property includes several fields on both sides of White Road. The general lay of the land adjoining the farmhouse tends to travel downward from the former Hamm Mine, over the McCandless property and towards the "Shade Brook" to the east of the McCandless house.

23. White Road runs in a northwest/southeast direction, dividing the McCandless land. White Road is a Class III town highway.

24. Upon cessation of mining activities, the open pit mine filled with water to become a nine acre pond. In 2003, the mine pond began overflowing at its northeastern corner near White Road and onto the McCandless property. The water collecting in the former mine has flowed on a generally continuous basis, with varying degrees of intensity, since at least 2003. The northeast portion of the mine pit edge became an unanticipated release point for water, which flowed into the ditches along White Road and onto the McCandless property.

25. This overflow caused[5] erosion of the McCandless' property, as well as sedimentation buildup in ditches along and in culverts underneath White Road. An August 2003 rainstorm increased the overflow so that it washed out a portion of White Road onto the McCandless fields. Evidence of this damage is depicted in the photos introduced at trial as Exhibits B and C.

26. The continuous mine overflow has contributed to a portion of the McCandless' fields becoming saturated and muddy, such that machinery can no longer safely travel over this portion of the McCandless fields.

---

[5] We are not concluding here that the water flowing from the former mine was the sole cause of erosion. Luzenac presented convincing evidence that the most serious erosion damage coincided with a significant rainstorm in August, 2003. But we remain convinced, based upon the evidence presented at trial that the mine water, flowing over an un-planned, not-engineered and non-permitted natural earthen dam contributed to the ongoing water and erosion damage.

6

27. Wetlands have been established on the McCandless property, due to the increased saturation, as depicted in the photo admitted as Exhibit F. Wetland vegetation, such as cattails, have become established that did not exist prior to the Hamm Mine filling and overflowing with water. The credible evidence at trial revealed that (a) the fields on the McCandless property were not so saturated prior to the mine overflow; (b) the wetlands appeared after the mine overflow; and (c) the overflow of water from the former mine and over the McCandless fields contributed to the establishment of the wetlands, thereby eliminating the productive use of a portion of the McCandless fields.

28. The Hamm Mine pond's spillage point functions as an unplanned spillway over a natural earthen dam. The capacity of the mine to retain water, and in cases of overflow, to act as a spillway, has not been tested nor certified by any engineer or regulating authority.

29. On November 26, 2003, Assistant District #2 Coordinator Linda Matteson wrote to Appellant Reese, advising Appellant Reese that it was his responsibility as the then-owner to address the impact from the recent mine pond overflow. Ms. Matteson also cited in this letter to the conditions relating to erosion and water control[6] from Permit #2W0551 and suggested Appellant Reese retain a professional engineer to assist in resolving the mine overflow issue.

30. By letter dated August 15, 2006, Appellee James McCandless sought a jurisdictional opinion from the District Coordinator regarding the status of Act 250 jurisdiction over the former Hamm Mine on the Reeses' property and the impacts resulting from the overflow of water originating at the former talc mine.

31. On October 26, 2006, District Coordinator April Hensel issued JO #2-241, finding that the mine property remained subject to Act 250 jurisdiction.

32. Luzenac and Reese thereafter filed timely appeals of JO #2-241 with this Court.

## Discussion

This appeal raises the narrow issue of whether Act 250 jurisdiction, originally conferred by Permit #2W0551, remains attached to the Hamm Mine property. As noted in our September 27, 2007 Decision, all fifteen of the issues preserved for our review by Appellant Luzenac's Statement of Questions and the additional issue raised by Co-Appellant Reese's Statement of Questions can be summarized in three general challenges to the District Coordinator's determination in JO #2-241 that Act 250 jurisdiction continues over the Hamm Mine property:

---

[6] These terms from the original Permit are discussed in ¶¶6–9, above.

7

(1) the reclamation plan was previously deemed complete in a prior jurisdictional opinion; (2) Land Use Permit #2W0551 expired on October 15, 2002; and (3) under the <u>Huntley</u>[7] doctrine, when reclamation is completed and a mineral extraction permit is expired, Act 250 jurisdiction ends. In our September 27, 2007 Decision, we concluded that:

1. Citing to precedent from the former Vermont Environmental Board, later affirmed by our Supreme Court—<u>Re: Dexter and Susan Merritt</u>, Declaratory Ruling #407, Mem. Decision at p. 6 (Vt. Envtl. Bd. June 20, 2002), aff'd by, <u>In re Merritt</u>, 175 Vt. 624 (2003)—we noted that a jurisdictional opinion is "only as good as the facts upon which it is based" and concluded that "[w]hen an applicant intends to materially deviate from plans upon which a permit is based, it has an affirmative duty to highlight these deviations for the Commission and present an amendment application." September 27, 2007 Decision at p. 10–11.

2. Even when a permit expires by its terms, the subject property may continue to be under Act 250 jurisdiction when the project has not been completed according to the terms and conditions of the original permit and its amendments. In this regard, site plans submitted by a permittee and approved by a district commission constitute permit conditions, by virtue of specific reference to the approved plans in the permit. September 27, 2007 Decision at p. 11–12.

3. The <u>Huntley</u> doctrine, as articulated by our Supreme Court, only pertains to mineral extraction projects where all permit conditions, including reclamation, have been satisfied. To the extent that a permittee "conduct[s] development activity not authorized by their permit", they have extended the original basis for Act 250 jurisdiction over the property. September 27, 2007 Decision at p. 12–13.

As a consequence of our legal determinations, we denied Appellants' then-pending motion for summary judgment and directed that the matter proceed to a merits hearing. We do not see the need to revisit our analysis of all the legal issues addressed in our September 27, 2007 Decision, but will now apply the applicable law to our factual determinations from the evidence presented at trial.

Many of the facts determined after trial mirror the material facts set forth in our September 27, 2007 Decision. For example, it remained undisputed that Luzenac's predecessor permittee replaced the approved sedimentation pond and discharge structures on the southeast corner of the mine with un-permitted sedimentation ponds on the northwest corner of the mine. Some additional facts became apparent from the evidence presented at trial, such as the fact that the replacement ponds were above the mine and higher in elevation, thereby making them useless in handling the flow of water subsequent to active mining operations. We also learned

---

[7] <u>In re Huntley</u>, 2004 VT 115 at ¶ 9, 177 Vt. 596, 597 (2004).

that Luzenac representatives made representations to the District Coordinator, the Windham Selectboard, and the abutters (Mr. McCandless and his father), that Luzenac would monitor the level of water that collected in the mine and take corrective measures, including pumping, when warranted. However, when the water began to reach the dangerous height of topping over the un-engineered earthen dam at its northeastern edge, the trial evidence revealed that Luzenac failed to take corrective measures. Luzenac understandably didn't follow through on their pledges regarding water flow and erosion control once they sold the property to Mr. and Mrs. Reese. But they also failed to provide any evidence at trial that the Reeses had been made aware of Luzenac's prior representations to monitor the mine pit water level and take corrective measures, if needed.

These facts, coupled with the original permittee's decision to not construct the sedimentation pond and discharge structures as approved, leads us to conclude that the permittee engaged in development activity that triggered continuing Act 250 jurisdiction. See Huntley, 2004 VT 115 at ¶1 and Act 250 Rule 34(A). The jurisdictional triggers here include both the substitution of the sedimentation ponds and the removal of the discharge structures, thereby leaving the water accumulating in the mine pit without a planned discharge structure. Neither of these development activities obtained permit approval. Thus, Act 250 jurisdiction did not expire with this permit and the mine site's reclamation; it continues to this day and until the important issues of water flow and erosion control are addressed.

Permit #2W0551 and its amendments specifically note that the "permittee, its assigns and successors in interest are obligated by this permit to complete and maintain the project only as approved by the District Commission . . .." Id. at p.1. Thus, Luzenac, its predecessors, and the Reeses, as its successors in title, remain obligated by the continuing Act 250 jurisdiction that arose as a consequence of the prior non-compliance with the original permit conditions.

Because this proceeding is limited to Appellants' challenge to JO #2-241, we do not have authority to address the questions of what actions may follow the continuation of jurisdiction. We leave to the parties here, in consultation with the District Commission and its Coordinator, to determine what actions may follow this proceeding.

We note that Luzenac raised the issue, undisputed at trial, that the District Commission staff knew or should have been aware that the original permittee had abandoned the approved sedimentation pond and replaced it and the related discharge structures with the un-permitted sedimentation ponds to the northwest. The replacement ponds were clearly delineated in the

revised site plans that were submitted in connection with Luzenac's 1995 application to expand the overburden disposal areas. The replacement ponds were also specifically approved by the Vermont Agency of Environmental Conservation in 1985, when that Agency issued a Temporary Pollution Permit (Exhibit 14). But we have not been cited to precedent, specific to land use law, that would apply a de facto approval of an alternate development plan, either because the permitting authority knew of the unauthorized development changes or of their approval by another permitting agency. We have found no such precedent upon which to rely and therefore decline to adopt Appellant's argument here.

To the extent that precedent from municipal proceedings is applicable to state land use proceedings, we've reviewed the Supreme Court's determinations in In re Appeal of Tekram Partners, 2005 VT 92. In reversing the trial court's finding of zoning violations, based upon a developer's failure to construct a development as permitted, the Tekram Court held that the subsequent inspection and issuance of a certificate of occupancy by the City of Burlington Zoning Administrator "had the effect of approving the disputed design features." Id. at ¶9.

One might view the admitted knowledge by the former Assistant District Coordinator of Luzenac's sedimentation pond substitution and subsequent issuance of a jurisdictional opinion, which concluded that the Hamm Mine project had been completed and reclaimed as planned, as analogous to the facts in Tekram. But we conclude that such an analogy would be in error. In Tekram, the Zoning Administrator was obligated under the applicable ordinance provisions to make her own inspection of the project and base the certificate of occupancy determination upon that inspection. Id. at ¶4–5. In contrast, a district coordinator bases her Act 250 jurisdictional opinion upon the information provided by the requesting party, the property owner, or other parties having standing. Act 250 Rule 3(A). While there is no prohibition to the district coordinator visiting the property and making her own inspection, such is not required. Id. It is for these reasons that we reached the conclusion in our September 27, 2007 Decision that a "jurisdictional opinion is 'only as good as the facts upon which it is based.'" Id. at 10. We conclude that there is a distinction between the certificate of occupancy procedures in Tekram that make it not applicable to the Act 250 procedure of requesting a jurisdictional opinion.

We also note that the Tekram court viewed the City's nine allegations of zoning violations as of "the most minor and technical" nature. Id. at ¶12. The violations addressed by the Supreme Court included the paving of two small areas, the placement of a waste dumpster in a disputed spot, and the failure to paint lines in a portion of one parking lot. The Hamm Mine

10

deviations from the approved plans were more substantial in nature and have contributed to significant water and erosion damage. The <u>Tekram</u> Court appeared motivated to conclude the parties' dispute by finding that these minor and technical variations should be regarded as approved by the subsequent inspection and issuance of a certificate of occupancy. No such rationale exists in the Hamm Mine proceedings.

Appellant also asserts a basis for declining to continue Act 250 jurisdiction that is best described as sounding in estoppel, on the argument that the permitting authorities knew of the alternate sedimentation ponds. But the doctrine of estoppel, as articulated by our Supreme Court (see <u>Greenmoss Builders, Inc. v. King</u>, 155 Vt. 1 (1990) and <u>Gravel and Shea v. White Current Corp.</u>, 170 Vt. 628 (2000)(mem.)) suggests an opposite result because it was Luzenac that made assurances to Mr. McCandless, the Windham Selectboard and the District Coordinator that they would monitor the water level at the mine and would disclose and take corrective measures if the water level became a concern. The Hamm Mine was one hundred and forty feet deep when mining stopped in 1995. It took eight years for the mine to fill with water; the ground, surface and rain water that filled the mine pit accumulated over a long period of time. And yet, when Luzenac sold the property to the Reeses, Luzenac had taken no corrective measures or even made disclosure, at least according to the evidence presented at trial. For these reasons, we decline to estop the District Commission or its parent, the land Use Panel of the Natural Resources Board, from asserting jurisdiction.

## Conclusion

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that the property upon which the Hamm Mine was once operated by Appellants Luzenac America, Inc. and U.S. Talc Co., Inc., now owned by Sean T. and Elizabeth Reese, continues to be subject to Act 250 jurisdiction.

A Judgment Order accompanies this Merits Decision. This completes the current proceedings before this Court in this matter.


Done at Newfane, Vermont, this 15th day of May, 2008.


_____
Thomas S. Durkin, Environmental Judge


11